[No. 1645.]

## D. M. Burke v. The State.

1. Practice—Accomplice—Charge of the Court.—Objection that the charge of the court did not properly define the term *accomplice*, will not be entertained when it appears that no exception was presented to the charge in the court below, nor a special charge requested to cover the point, and that the question was not made a ground in the motion for new trial. In view of another trial, however, it is suggested that, the trial court having charged that an accomplice was one who was "criminally connected with the offense committed," should have instructed the jury as to what would constitute a criminal connection with the offense charged. See the opinion *in extenso* for the principle illustrated.

2. Theft—Practice—Evidence.—See the statement of the case for acts and declarations of a third party *held* to have been admissible upon two grounds only, neither of which existed in this case; first, that a conspiracy had been shown between the declarant and the defendant in the theft of the cattle, and that at the time of the acts and declarations the common design of the conspiracy had not been fully accomplished; or, second, that the defendant was present and acquiesced in the said declarations and acts. Note, also, the opinion for insufficient reasons assigned

by the trial judge for refusing to sustain a motion to exclude the objectionable testimony after it had been erroneously admitted.

3. SAME.—Notwithstanding the rule that incompetent evidence should be objected to when offered, it is a proper practice in this State to exclude such evidence from the jury after it has been erroneously admitted without objection, upon proper motion being made.

APPEAL from the District Court of Hood. Tried below before the Hon. A. J. Hood.

The indictment charged the appellant with the theft of a cow and calf, the property of Charley Shands, in Tarrant county, Texas, on the tenth day of January, 1883. Conviction was the result of the trial, and a term of three years in the penitentiary was the penalty awarded.

Charley Shands, the first witness for the State, testified that both he and defendant lived in Fort Worth. The witness owned the cow and calf for the theft of which the defendant was now being prosecuted. They were stolen on the night of January 10, 1883, from witness's house, in Fort Worth. The cow was taken from the lot near the house, and the calf from the vicinity outside. On the morning after the theft, witness found the bars of his lot down, and, on the outside the tracks of two horses, one smaller than the other. The tracks of two horses, and those of the cow and calf led together down the hill and across an adjacent branch, and were plain until they crossed the branch and passed into the road, where the trail was lost. At the time of the theft of the cow and calf, the defendant had a hog pen in West Fork bottom, about two or three hundred yards east of the witness's house, where he fattened hogs for market. The defendant had to pass the witness's house going to and from his pen, which he did usually two or three times a day. He knew the witness's cow well, and a short time before the theft tried to trade with witness for her. Witness did not see the defendant for three days after the theft. He then saw him, his partner, Lon. Jewell, and an employee named Will. Sealy, at the hog ranch. He then had a conversation with defendant about his cow and calf, and defendant said that he would keep a look out for her, and notify witness if he could hear of her. Witness told him that if he would find and deliver her, he would pay defendant ten dollars, or would pay him five dollars for information which would lead to her recovery.

Two or three weeks after the theft, witness and W. Foster went to Parker Station, in Parker county, on the cars, and thence walked four miles to the defendant's ranch, which they reached late in the afternoon. They did not go into the house, but went to the cow pen, near by, where they found the calf which had been stolen. They went thence to the justice of the peace of that precinct, and returned next morning to the defendant's ranch, and there found the cow. Witness there saw Mr. A. J. Otto, who had charge of defendant's ranch, and got his cow and calf from him. Witness also saw Mrs. Otto there, and learned that the defendant had been to the ranch on the day before, and had seen the cow and calf. Witness reached home with his cow and calf about nine o'clock that evening, and learned that defendant had been to his house to see him about the animals. The defendant, at the time of the theft, owned a tolerably large mare, and a pony. Witness saw no one take his cow, and did not, of his own knowledge, know who did.

Will. Sealy testified, for the State, that he worked for the defendant during the preceding winter, stayed at his house in Fort Worth, and assisted him with his hogs and stock in Parker county. Witness knew Charley Shands. One night, in February last, witness and defendant went to Shands's cow lot, turned his cow out and drove off her and her calf, which they found outside. Witness let the gap down while the defendant remained on his horse on the outside. They drove the cow and calf off in a southerly course, across the branch and to the east side of the railroad stock pens, which are about a mile south of Shands's house, and there they turned west. Defendant went with witness and the cattle until they reached the toll bridge on Clear Fork, about three miles from Shands's house. Then the defendant left and directed the witness to drive the cow and calf to his ranch in Parker county; which the witness did. Witness was riding defendant's small pony, and defendant was riding Mr. Jewell's larger one. Before this, the defendant had asked the witness to go to Shands's by himself and get the cow and calf; which witness refused to do. The cow and calf were taken for the defendant. Witness was working for defendant at fifteen dollars per month. Some two weeks prior to this transaction, witness helped the defendant take eighteen or twenty head of cattle to his ranch. Some two or three weeks after witness and defendant took Shands's cow and calf, Mr. Otto, who had charge of defendant's ranch, came to defendant's, in Fort Worth, and

had a talk with defendant. Shortly after that, defendant called the witness aside and told him that Otto said the negroes had come and got those animals, and that witness had better leave; that, as soon as he got clear himself, he would send for witness and clear him. Defendant went down to Shands's house that night. He had been out to his ranch the week before, and returned on Sunday night.

Cross-examined, the witness said that he supposed he was under arrest for stealing Shands's cow. He had made a contract with prosecuting attorney Pendleton to testify in this cause. That contract was to "swear Burke in, so I can get out." Witness got nothing for helping defendant steal the cow and calf. His mother, who lives near Fort Worth, wrote to the witness about two weeks ago to return and turn State's evidence. Witness got to the ranch with the cattle next day about one or two o'clock, put them in the pen, and told Mrs. Otto that he had brought another cow for Mr. Burke. He did not try to sell her the cow and calf; did not tell her that his mother had raised the cow, and that he owned and had milked the cow in a dairy for five years. He did not make the same representations to Mr. Otto, nor try to sell, or trade him the cow for a younger one.

On his re-examination, the witness said that the prosecuting attorney had never, until the morning of this trial, talked to him about this case. In agreeing to turn him loose he only exacted of the witness that he should tell the truth. To a juror he replied that the defendant promised him ten dollars for his aid in the theft, but had never paid him.

Mrs. Shands testified, for the State, that on Sunday, some two or three weeks after the cow and calf were stolen, her husband, the prosecuting witness, and Foster, went to defendant's ranch, in Parker county, and returned on Monday night with the animals. About seven o'clock on Sunday evening, during her husband's absence, defendant came to witness's house and told her that he thought he knew where the animals were. She asked where, and he replied: "About twenty-five miles from here." He came back early Tuesday morning and told Foster that he thought he knew where the animals were. Foster replied: "Yes; I know where they are, too." Defendant asked: "Where?" and Foster replied: "Out there in the lot."

Mrs. A. J. Otto testified, for the defense, that some time after Christmas, Will. Sealy arrived at defendant's ranch with a cow and calf. Witness did not remember the month or day. He

said: "I have brought you another cow," and tried to sell the cow to the witness as a cow of his own, which his mother had raised, and which, he said, he had milked in a dairy for five years. Witness's husband was absent, and she was out of wood, wherefore, she got Sealy to remain a day or two with her and replenish her stock of wood, and then sent him to Fort Worth after the defendant. He returned in about a week, and reported the defendant sick. When Sealy brought the cow to the ranch he put her and the calf in the lot, and asked witness to take care of them for him. No one was then present except the witness and her children. After the animals had remained at the ranch some two or three weeks, Charley Shands, who claimed the animals, and another man, came to the ranch and got them. Mr. Otto was at home on that occasion. Defendant was at the ranch on the Sunday before Shands got the animals, and saw them in the lot.

Cross-examined, the witness stated that her husband and she had been keeping cattle at the ranch for defendant for about three years. He usually kept from forty to seventy head on the ranch—buying and selling. He kept a small number of cattle there for other parties. The land belonged to Mr. Otto. Defendant came to the ranch but once while the cow and calf were there, and that was on Friday before they were taken away on Monday. Sealy did not tell witness that the cow was Burke's; he said she was his property. Witness did not see Shands and Foster pass the ranch on Sunday, before defendant left the ranch on that evening, but did see two footmen pass a short time after. Defendant left the ranch that Sunday evening in company with Balden Reynolds. Witness did not tell Shands that Sealy told her the cow was defendant's, when he brought her to the ranch, and that he had sold her to defendant for twenty dollars. Did not tell Shands that the defendant, on the day before, claimed the cow, and said that he had bought her of Sealy for twenty dollars, and that she would swear it. Her husband did not tell Shands that the cow belonged to Burke, and that Burke had bought her from Sealy. He did not promise Shands not to go to Fort Worth, if he (Shands) would go on home with the cow. He did go to Fort Worth, leaving shortly after Shands left with the cow, but he was going that morning any way. Witness's husband was in the Weatherford jail once for eating a steer that got its neck broke. Mr. Burke was on Mr. Otto's bond now.

Balden Reynolds testified, for the defense, that he boarded at

Otto's, and kept a small bunch of cattle on defendant's ranch. Remembers that Sealy, some time after Christmas, brought a pale red cow and calf to the ranch, and offered to trade the cow as his, to witness, for a saddle. He said his mother had raised the cow, and that he had milked her in a dairy for five years.

Mr. Aaron testified, for the defendant, that prior to last Christmas he took his meals at defendant's house, and slept at his own house near by. Will. Sealy was working for the defendant at that time. He slept with the witness one night, and told the witness that he had five head of cattle out about Big Springs, and that he had started out there with a cow that his mother had raised, and had got about twenty-five miles with her and had left her. Witness left Burke's on the day before Christmas, 1882, and that it was before that time that Sealy told him about his cow.

Will. Sealy, recalled by the State, in rebuttal, testified that he slept with Aaron once while working for Burke. He did not, on that occasion, tell him that he started to Big Springs with a cow and left her out about twenty-five miles. It was after the cow was taken by witness and defendant that witness slept with Aaron.

Charles Shands, in rebuttal, testified for the State, that on the morning he took the cow from the ranch, Mrs. Otto told him that the animal belonged to defendant; that Sealy had brought her there and told her that he sold the cow to the detendant for twenty dollars, and that the defendant, on the day before, told her that the cow was his, and that he bought her from Sealy for twenty dollars, and that she would swear to it. On the morning he took the cow, the witness told Otto that he was going to the station and telegraph sheriff Maddox to arrest defendant and Sealy, and Otto told the witness that that was not the way to do; but not to go to the station—to go home with the cow, see the defendant, and the defendant would do right about it. Witness replied that if he, Otto, would promise him not to go to Fort Worth himself, and would not telegraph defendant, that he would not go by the station. Otto replied that he had no business in Fort Worth, and would do neither. After witness got some distance with the cow, he saw Otto going off to the right toward the station, in a trot.

The motion for new trial denounced the verdict as against the law and the evidence; it arraigned the conviction as having been had upon the uncorroborated testimony of an accomplice;

it presented the affidavit of the defendant's wife, showing that, had she not been in present expectation of confinement, she would have been present at the trial and establish?d by her testimony an *alibi* for the defendant; and it raised the question involved in the ruling of the court.

*Furman & Capps* and *W. G. Horsley*, for the appellant. The grounds upon which we rely for a reversal of this judgment will be found in the amended motion for a new trial.

The first ground set up is, "Because the court erred in refusing to sustain defendant's motion to strike out the testimony of State's witness Charlie Shands, as is shown by defendant's bill of exceptions."

This bill of exceptions will disclose the fact that, after the defendant's witnesses had testified, the State again placed Charlie Shands upon the stand, and that said witness then detailed a conversation which he claimed had taken place between himself and one Mr. Otto; the said Otto having been sworn and placed under the rule as a witness for the defendant, but never used on the stand; and said purported conversation, as detailed by the witness, being of a very injurious character to the defendant. The court, in signing said bill of exceptions, added the following reasons why said evidence was allowed to remain before the jury: "First: Defendant by his attorney had opportunity to object to the question, and had not done so. Second: While the witness was making his statement and testifying in response, as above shown, defendant by his attorney had ample opportunity to interpose objections to said testimony, but made no objection until said witness had ended his statement, and then moved to exclude. Third: It had been shown in evidence that said Mr. Otto was then in the employ of the defendant, D. M. Burke, and in charge of his ranch and cattle in Parker county, and in possession of said cow and calf at the time and place spoken of by said witness, Charlie Shands. Fourth: Said Mr. Otto had been by the defendant sworn as a witness in this case, and was not placed on the stand. Fifth: The defendant had before, on the trial, placed Mrs. Otto, wife of said Otto, on the stand, and said Mrs. Otto had, for defendant, testified in this cause, as is shown by the statement of facts."

The care which the learned judge took in writing out so many separate reasons, and the kind of reasons given why he refused to strike out this evidence, would seem to indicate that he was

not himself satisfied with his ruling, and that there was doubt as to its legality. Whenever the admissibility of evidence is doubtful, law, justice and humanity all demand that the doubt should be decided in favor of innocence and liberty.

Our objection to this evidence is that it is hearsay. In the case of *Tyler* v. *The State,* 11 Texas Court of Appeals, 389, the conviction was set aside because the State had been permitted to prove what one Cochran had said, not within the hearing of the defendant. And in the case of *Langford* v. *The State,* 9 Texas Court of Appeals, 287, the conviction was set aside because the State had been permitted to prove what the wife of the defendant had said, not in the presence of the defendant. If the evidence was originally inadmissible, was the failure to object to the questions asked the witness Shands, and the failure to object to the evidence before the motion to strike out was made, such neglect as will prevent the defendant from having relief now? This was evidently the view taken by the learned judge who tried the case. It has always been held by this court that where objections to the admissibility of evidence come after verdict, they are then too late. It has also been held, and we think, properly, that when the defendant's counsel ask illegal questions and draw out illegal evidence, they then cannot be permitted to complain at the action of the court in refusing to strike out said testimony, it being the direct result of their own folly, and no one being to blame for it except themselves. But these are not parallel cases to the question at bar.

In this case the objectionable evidence was brought out by the State's attorney, and defendant's counsel had no part nor parcel in its production. It is true we might have objected a moment sooner than we did, but every one knows that on the spur of the moment and in the hurry of the trial, even the most able and skilled counsel cannot always—in a moment—determine as to whether an objection should be made. We could not tell, until said witness had finished his statement, whether or not he might mention some fact which would make said evidence admissible. And, inasmuch as the prosecution was being conducted by learned and able counsel, it was proper to presume that the evidence would in some manner be connected in such a way as to make it admissible. When, however, the witness was through, and it became manifest that the evidence was inadmissible, a motion was made to strike it out. An objection to illegal evidence is in time if made when the illegality of the evidence is

discovered (*Daffin* v. *The State*, 11 Texas Ct. App., 79); and we submit that it ought to be sustained if made at any time before the argument is commenced, unless it clearly appears that counsel have been criminally negligent or have attempted to trifle with the court. The third reason given by the district judge for refusing to strike out this evidence is, that Mr. Otto was then in the employment of Mr. Burke, and in charge of his ranch, and was in possession of the cow and calf at the time of the alleged conversation. This, we suppose, is on the ground that the declarations of Otto were regarded by the court as the declarations of a co-conspirator. The theft is alleged to have been committed in January. At that time Otto was confined in jail at Weatherford, and did not know anything about it. The fact that two weeks afterward, when the offense was complete, he was found in possession of the cow and calf, does not make him a conspirator, for theft is not a continuing offense. (*Lacy* v. *The State*, 7 Texas Ct. App., 410.) Again, if a conspiracy had been proven, this evidence would not then be admissible, because the declarations given in evidence were made after the alleged offense was completed; the rule of law being that a party's declarations can only be used against himself, unless made in pursuance of a common design, in a conspiracy, prior to or at the time of the commission of the offense. (*Phillips* v. *The State*, 6 Texas Ct. App., 6; *Simmons* v. *The State*, 10 Texas Ct. App., 160.)

The fourth ground given by the district judge is that Mr. Otto had been sworn as a witness by the defendant and never used. We have searched the authorities diligently, and have been unable to find any support for this proposition, viz: That if the defendant summons a witness, presents him in court and has him sworn, but does not use him on the stand, that then the State is authorized to put witnesses on the stand and prove as original evidence against the defendant what this uncalled witness may have stated not under oath. This is just what the ruling of the District Court amounts to, and we submit that it is an innovation upon our practice, alike subversive of law and dangerous to innocence.

The fifth ground given by the court is that the defendant had placed Mrs. Otto, wife of said Otto, on the stand, and that Mrs. Otto had testified as is shown by the statement of facts. We suppose that the idea of the court was that this evidence was admissible as impeaching the credibility of Mrs. Otto. There

are, however, two objections, each of which is a conclusive answer to such an idea. The first is that while witnesses may be impeached by showing that they have made statements out of court, material to the issues joined, different from their testimony on the witness stand, yet this is an exception to the general rule excluding hearsay evidence, and, like all exceptions, must be strictly construed. We confidently assert that there is not a single authority to be found in the books in which a witness's credibility can be attacked by showing that other persons may have made statements out of court, even in the presence of the witness, different from that of the evidence of the witness. The limitation is as to statements made by the particular witness in question, whom it is sought to impeach, out of court or at another time, that differs from the testimony of the witness, and then these statements are restricted to such as are material to the issue. But again, the bill of exceptions and the statement of facts all fail to show that Mrs. Otto was present when Charlie Shands and Mr. Otto had the conversation which Charlie Shands relates when he is called back to the witness stand. It is true that Mrs. Otto did hear something that passed between them, but it was not pretended by the statement of said Shands that she heard all that was said, or that she heard any part of what he details in the bill of exceptions. We will close our discussion of this bill of exceptions with the remark that as in three of the reasons given by the judge in his appendix to the bill of exceptions, he seems to think that the evidence was originally admissible, counsel ought certainly to be excused, and could not be liable to very great censure for not making an objection at an earlier moment.

*J. H. Burts*, Assistant Attorney General, for the State.

WILLSON, JUDGE. 1. It is argued by counsel for defendant that the learned trial judge, in his charge to the jury, did not sufficiently define and explain the term "accomplice," as used in Article 741 of the Code of Criminal Procedure. This objection was not presented in the court below by exception to the charge, nor by requesting a special charge, nor by making it a ground in the motion for a new trial. We are not, therefore, called upon to consider it; but, in view of another trial of the case, will suggest that the learned judge, having told the jury that an accomplice was one who was "criminally connected

with the offense committed," should have instructed them further as to what would constitute such criminal connection with the theft here charged on the part of the State's witness Sealy. In other words, the jury should have been told that if the witness Sealy, knowing the intent of the defendant to steal the cattle, aided and assisted him in the commission of the theft, then he, the witness, was an accomplice within the meaning of the article cited, notwithstanding he might have been, at the time, the hired hand of the defendant, and acting for and under the orders of the defendant in taking the cattle.

2. Upon the trial the State proved by Shands, the owner of the stolen cattle, a certain conversation had by him with one Otto, in relation to the cattle, and also certain conduct of said Otto with reference to said cattle. Otto was in possession of the cattle at the ranch of the defendant at the time Shands, the owner, found and recovered them. These declarations and acts of Otto, as testified to by Shands, tended to connect the defendant with the theft of the cattle, and the effect of such testimony would unquestionably be prejudicial to the defendant. No objection was made to it at the time it was introduced, but when the witness had finished testifying, defendant's counsel moved to exclude this portion of his testimony because incompetent for any purpose; which motion was refused; and to this action of the court exception was taken and saved by bill.

In signing the bill of exception, the learned judge states that he refused and denied the motion upon the following grounds: "First. Defendant, by his attorney, had the opportunity to object to said questions, and had not done so. Second. While the witness was making his statement, and testifying in response thereto, as above shown, defendant had ample opportunity to interpose objections to said testimony of witness Shands, but made no objections until the witness had ended his statement, and then moved to exclude. Third. It had been shown in evidence that said Otto was then in the employ of the defendant, and in charge of his ranch and cattle, and in possession of said cow and calf at the time and place spoken of by the witness Shands. Fourth. Said Otto had been, by defendant, presented and sworn as a witness in this case for defendant, and was not placed on the stand by said defendant. Fifth. The defendant had before, on the trial, placed Mrs. Otto, wife of said Mr. Otto, on the stand, and Mrs. Otto had, for the defendant, testified in this case, as shown by the statement of facts."

None of the foregoing reasons would make the testimony complained of competent and admissible. It would be admissible evidence upon two grounds only: First, that Otto and the defendant were co-conspirators in the theft of the cattle, and that, at the time of the said declarations and acts of said Otto, the common design of the conspiracy had not been fully accomplished; or, second, that the defendant was present and cognizant of the said declarations and acts of said Otto. Neither of these grounds, however, existed in this case, and we are clearly of the opinion that this portion of the testimony of Shands was incompetent and inadmissible against the defendant for any purpose.

But, not having been objected to at the time it was introduced, is the defendant thereby precluded from objecting to it by motion to exclude it? We think not. It is the proper practice, where it can be done, to object to evidence when it is offered, but it is frequently the case that illegal evidence gets before the jury before any objection can be interposed to it. It has always been the practice in this State to entertain a motion to exclude incompetent testimony, though not objected to at the time it was offered and introduced. (*Gaines* v. *Salmon*, 16 Texas, 311; *Hubby* v. *Camplin*, 22 Texas, 582; *Sharp* v. *Baker*, Id., 306.)

We are of the opinion that the court erred in refusing to exclude that portion of the witness Shands's testimony which detailed the statements and conduct of Otto, because the same was incompetent evidence against the defendant, and was calculated to prejudice his case in the minds of the jury; and for this error the judgment must be reversed and the cause remanded.

Other errors complained of are not considered, because they are of a character that will not likely occur in any future trial of the case. The judgment is reversed and cause remanded.

*Reversed and remanded.*